# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| AKASH SHAHI, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | Case No. 20 C 7590 |
| | ) | |
| v. | ) | |
| | ) | Judge Jorge L. Alonso |
| UNITED STATES DEPARTMENT OF | ) | |
| STATE, MICHAEL POMPEO, CHAD | ) | |
| WOLF, and ROBERT REDFIELD, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs are one hundred eighty-eight disappointed diversity visa petitioners, as well as certain of their U.S. sponsors and prospective employers. Plaintiffs complain that defendants, the United States Department of State and the Secretary of State, Secretary of Homeland Security, and Director of the Centers for Disease Control and Prevention, are responsible for certain actions and policies in 2020 that prevented the visa-seeking plaintiffs' petitions from being adjudicated. Claiming that defendants' policies violated the Immigration and Nationality Act, 8 U.S.C. § 1152(a)(1)(A), Rehabilitation Act, 29 U.S.C. § 794(a), Administrative Procedure Act, 5 U.S.C. § 706(2), and their due process rights, plaintiffs seek adjudication of the visa petitions, as well as compensatory and declaratory relief. Defendants move to dismiss under Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6), arguing that plaintiffs lack standing and fail to state a claim. For the following reasons, the Court agrees with defendants that plaintiffs lack standing. Therefore, defendants' motion to dismiss is granted.

## I. Background

This case concerns the diversity visa program, which establishes a hybrid lottery/application process for individuals "from countries underrepresented in the immigration process" to enter the United States as "lawful permanent residents who may live and work here indefinitely." *Almaqrami v. Pompeo*, 933 F.3d 774, 776–77 (D.C. Cir. 2019). The Department of State is permitted by law to grant as many as 55,000 diversity visas each fiscal year. *See* 8 U.S.C. §§ 1151(e); *see* 8 U.S.C. § 1153(c).

The first step in the diversity visa process is the lottery. Diversity visa hopefuls must submit a petition to the Department of State, and the Department assigns each petition in each of various regional areas a rank-order number at random. 22 C.F.R. 42.33(c). The Department then selects according to rank-order "a quantity of petitions for each region estimated to be sufficient to ensure, to the extent possible, usage of all immigrant visas authorized" by law for that fiscal year. *Id.* Petitions selected in this manner are considered to have been "approved." *Id.*

Once the petition has been approved, the petitioner must submit an application and various supporting documents to obtain a reserved visa number. *See* 8 U.S.C. § 1202(b); 22 C.F.R. §§ 42.33(f)-(g), 42.61-67. After obtaining a visa number, the petitioner may schedule a consular interview, and if he or she meets the statutory criteria, the Department of State "shall" issue a diversity visa. 8 U.S.C. § 1153(c), (e)(1), 22 C.F.R. §§ 40.6, 42.81(a).

The diversity visa program restarts at the beginning of each new fiscal year. Therefore, every year after midnight on September 30, any outstanding approved petitions are no longer considered approved, 22 C.F.R. 42.33(d), visa numbers are no longer allotted for any outstanding approved petitions, 22 C.F.R. 42.33(f), and consular officers may not issue diversity visas based

on any outstanding petitions or applications. 8 U.S.C. §§ 1153(c)(1), 1154(a)(1)(I)(ii)(II); 22 C.F.R. § 42.33(a)(1), (d); *see* 31 U.S.C. § 1102.

The visa-seeking plaintiffs all submitted petitions that were selected in the lottery and approved. However, their applications were subsequently derailed by certain policies adopted by defendants, ostensibly in response to the COVID-19 pandemic. Plaintiffs argue that the pandemic was a pretext, and these policies instead stemmed from the Trump administration's animus toward the diversity visa program.

On March 20, 2020, the Department of State issued its COVID-19 guidance. In accord with that guidance, the Department indefinitely suspended all routine visa processing, and United States consular posts worldwide were directed to cease scheduling visa appointments, except as necessary to provide emergency and "mission critical" visa services. These were defined as "the processing of certain non-immigrant visas, such as those for diplomats and government officials, temporary agricultural workers, medical professionals, air and sea crew, and applicants with medical emergencies." (Compl. ¶ 726, ECF No. 3.) This guidance halted all diversity visa processing and interviews.

On April 20, 2020, President Trump issued Presidential Proclamation 10014. The Proclamation suspended the entry of all immigrants to the United States for sixty days, with certain exceptions, including an exception for any immigrant "whose entry would be in the national interest, as determined by the Secretary of State, the Secretary of Homeland Security, or their respective designees." (*Id.* ¶ 734.) On June 21, 2020, President Trump signed Presidential Proclamation 10052, which extended Proclamation 10014 and instructed the Secretaries of State, Labor, and Homeland Security to "establish standards to define categories of aliens covered by" the "national interest" exception. (*Id.* ¶ 743.)

In guidance offered since the issuance of these Proclamations, the Department of State continued the suspension of routine visa processing and directed consular posts to adjudicate visa applications only for applicants who met an exception to the Presidential Proclamations, including the national interest exception, and that fell into a mission critical category. However, according to plaintiffs, diversity visa applicants had already been defined out of those categories by the Department, particularly since their applications were not considered "mission critical," so there was no way for them to obtain adjudication of their applications. Further, under the Department's four-phase "Diplomacy Strong" framework for resumption of normal operations, the adjudication of diversity visas remained suspended until Phase 4—even though Phase 3 was characterized as the resumption of routine services. Thus, diversity visas remained the lowest priority and were only to be processed to "prevent complete stagnation." (*Id.* ¶ 749.) Consulates around the world informed diversity visa applicants that they could not schedule any new interviews. (*Id.* ¶ 759.) Plaintiffs' visa applications were never adjudicated.

Plaintiffs filed this suit on December 19, 2020. They assert their claims in seven counts: Count I, for violating the anti-discrimination provision of the Immigration and Nationality Act, 8 U.S.C. § 1152(a)(1)(A); Count II, for violating the Rehabilitation Act by failing to provide reasonable accommodations and discriminating against plaintiffs, *see* 29 U.S.C. § 794(a); Count III, for violating the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2), by failing to adjudicate their visa applications based on unlawful, discriminatory, arbitrary and capricious policies; Counts IV, V, and VI, for violating plaintiffs' due process rights under the Fifth Amendment; and Count VII, for equitable relief that prevents defendants from enforcing the September 30, 2020 fiscal-year-end deadline against plaintiffs. In their prayer for relief, plaintiffs request declaratory relief and an order either (a) requiring the Department of State to complete the

adjudication of the visa-seeking plaintiffs' 2020 diversity visa applications, or, in the alternative, (b) requiring defendants to refund all fees plaintiffs have expended for the processing of their applications and to repay plaintiffs for the medical certifications they sought as part of their futile visa applications.

## II.   Legal Standards for Rule 12 Motion to Dismiss

Defendants move to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) and (6).

"Rule 12(b)(1) is the means by which a defendant raises a defense that the court lacks subject-matter jurisdiction," such as a challenge to the plaintiff's standing. *Bazile v. Fin. Sys. of Green Bay, Inc.*, 983 F.3d 274, 279 (7th Cir. 2020). Where the defendant makes a facial challenge to the sufficiency of the allegations of the complaint regarding subject matter jurisdiction, the court "accept[s] all well-pleaded factual allegations as true and draw[s] all reasonable inferences in favor of the plaintiff." *Prairie Rivers Network v. Dynegy Midwest Generation, LLC*, 2 F.4th 1002, 1007 (7th Cir. 2021) (citing *Silha v. ACT, Inc.*, 807 F.3d 169, 173 (7th Cir. 2015)). When the defendant contends that "'there is *in fact* no subject matter jurisdiction,'" even if the pleadings are "formally sufficient," the court may "look beyond the pleadings and view any evidence submitted to determine if subject matter jurisdiction exists." *Silha*, 807 F.3d at 173 (quoting *Apex Digital, Inc., v. Sears, Roebuck, & Co.*, 572 F.3d 440, 444 (7th Cir. 2009)).

A motion under Federal Rule of Civil Procedure 12(b)(6) tests whether the complaint states a claim on which relief may be granted. *Richards v. Mitcheff*, 696 F.3d 635, 637 (7th Cir. 2012). Under Rule 8(a)(2), a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The short and plain statement under Rule 8(a)(2) must "give the defendant fair notice of what . . . the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks

omitted). The complaint's "[f]actual allegations must be enough to raise a right to relief above the speculative level," *Twombly*, 550 U.S. at 555; that is, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. The Court must "construe the complaint in the light most favorable to plaintiff, accept all well-pleaded facts as true, and draw reasonable inferences in plaintiff's favor." *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020); *see also Silha*, 807 F.3d at 174 (noting that courts apply the same standard to facial challenges to standing). However, it need not "accept as true legal conclusions, or threadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009). The Court may consider, "in addition to the allegations set forth in the complaint itself, documents that are attached to the complaint, documents that are central to the complaint and are referred to in it, and information that is properly subject to judicial notice." *Williamson v. Curran*, 714 F.3d 432, 436 (7th Cir. 2013).

## III. Analysis

The Court begins with standing—as it must, because if plaintiffs lack standing, the Court lacks jurisdiction, and "it [is] improper for courts to skip over jurisdictional issues in order to reach the merits." *Yassan v. J.P. Morgan Chase & Co.*, 708 F.3d 963, 967 n.1 (7th Cir. 2013) (citing *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-94 (1998)). Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" and "Controversies." *See Taylor v. McCament*, 875 F.3d 849, 853 (7th Cir. 2017). To "ma[k]e out a 'case or controversy' between

himself and the defendant within the meaning" of Article III, the plaintiff must show that he has "standing" to sue by "'alleg[ing] a personal stake in the outcome of the controversy.'" *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (quoting *Baker v. Carr*, 390 U.S. 186, 204 (1962)). That is, he must be able to show that he has "'(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'" *Taylor*, 875 F.3d at 853 (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).

According to defendants, the third element of standing is lacking here. In particular, defendants argue that plaintiffs' injury cannot be "redressed by a favorable judicial decision" because the Court lacks the power to grant them any of the concrete relief they seek. Apart from declaratory relief, plaintiffs ask the Court to order defendants to adjudicate their visa applications or to award monetary relief. According to defendants, the Court cannot grant this relief because (1) the Department of State lacks the statutory power to adjudicate diversity visa applications following the expiration of the fiscal year in which they were submitted, and (2) the monetary relief plaintiffs seek is barred by sovereign immunity.

## A. Adjudicating The Visa-Seeking Plaintiffs' Applications

Defendants argue that prior precedent firmly establishes that, once the fiscal year expires, the government lacks the statutory authority to adjudicate any visa applications submitted during the preceding year. Although the result is harsh, the Court is forced to agree.

This case is controlled by *Iddir v. INS*, 301 F.3d 492, 500-01 (7th Cir. 2002). In *Iddir*, the plaintiffs submitted diversity visa petitions, and their petitions were selected in the lottery; however, as here, the government[1] failed to schedule interviews before the expiration of the fiscal

---

[1] The plaintiffs in *Iddir* were already living in the United States, but not as permanent residents authorized to live and work here indefinitely. Diversity visa selectees in such circumstances must apply to the U.S. Citizenship and Immigration Services—or, at the time of *Iddir*, its predecessor agency, the Immigration and Naturalization Service—for adjustment of status, rather than to the

year, so the plaintiffs' applications were never adjudicated. *Id.* at 494-95. The plaintiffs sought a writ of mandamus compelling the government to adjudicate their cases. The Seventh Circuit explained that the plaintiffs had a clear right under the relevant statutes to adjudication of their cases within a reasonable time frame—but "[n]evertheless, the relief" that the plaintiffs sought was "illusory" because "the statute unequivocally states that the applicants only remain eligible 'through the end of the specific fiscal year for which they were selected.'" *Id.* at 500-01 (quoting 8 U.S.C. § 1154(a)(1)(I)(ii)); *see* 8 U.S.C. § 1153(c)(1). The court recognized that "[i]t would be a different case had the district court ordered the INS to adjudicate the appellants' status *while* the INS maintained the statutory authority to issue the visas." *Iddir*, 301 F.3d at 501 n.2 (citing, *e.g.*, *Paunescu v. INS*, 76 F. Supp. 2d 896, 902 (N.D. Ill. 1999), and *Marcetic v. INS*, No. 97 C 7018, 1998 WL 173129, at *1-2 (N.D. Ill. Apr. 6, 1998)). If that were the case, the court explained, the government would be "on notice to reserve visas and [to] complete the task, as ordered, before time expires," and to allow the government to seek protection behind the statutory deadline would "impinge the authority of the court." *Iddir*, 301 F.3d at 501 n.2; *see Ahmed v. Dep't of Homeland Sec.*, 328 F.3d 383, 387 (7th Cir. 2003). But the plaintiffs had not obtained any court-ordered relief before the expiration of the "statutory deadline" Congress had set, and therefore the government lacked the "statutory authority to award the relief sought by plaintiff," so the Seventh Circuit concluded that it lacked jurisdiction. *Iddir*, 301 F.3d at 500.

---

Department of State for a consular interview. *See Almaqrami*, 933 F.3d at 776 n.1. This distinction is immaterial for purposes of this case. *See Ahmed v. Dep't of Homeland Sec.*, 328 F.3d 383, 387-88 (7th Cir. 2003) ("Just as in *Iddir,* therefore, the district court had no choice but to deny [the plaintiff's] petition for a writ of mandamus, because any relief ordered by the court could not be implemented without violating the substantive limitations of the statute creating the diversity visa program. The fact that Ahmed was a person living abroad seeking such a visa, and the parties in *Iddir* appear to have been in the United States on other grounds, is immaterial to this aspect of the case.").

*Iddir* is not identical to this case because the panel majority's reasoning was that, in the absence of a duty to adjudicate the plaintiffs' visa applications, the court lacked mandamus jurisdiction under 28 U.S.C. § 1361. *Iddir*, 301 F.3d at 500-01. Plaintiffs are not seeking a writ of mandamus in this case. But this difference in procedural posture does not change the fact that *Iddir* directly held that the government "lacks the statutory authority" to adjudicate a visa application after the "statutory deadline" expires at the end of the fiscal year, except to enforce a court order to do so. It follows that plaintiffs lack standing here.

In *Iddir*, Judge Flaum concurred in the judgment and wrote separately that he would have resolved the case on mootness grounds because, although it made "but a hair's breadth" of difference, it was the government's "lack of *power* to grant effectual relief—not its lack of duty— that ma[de] the claims nonjusticiable." *Id.* at 502 (Flaum, J., concurring in the judgment). He later explained in a different case, writing for a unanimous Seventh Circuit panel, that this logic is "equally applicable in the standing context," because "'[m]ootness is the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness).'" *Taylor*, 875 F.3d at 854 (quoting *Parvati Corp. v. City of Oak Forest, Ill.*, 630 F.3d 512, 516 (7th Cir. 2010)). Thus, in *Taylor v. McCament*, which was another case in which a disappointed visa applicant sought relief that the relevant statute did not permit because it was inconsistent with explicit statutory time limitations, Judge Flaum explained that "[t]he reasoning in *Iddir* suggests that a plaintiff loses standing—*i.e.*, their claim becomes moot—if the relevant agency loses statutory authority to award the relief sought." 875 F.3d at 854 (citing *Iddir*, 301 F.3d at 500-02). The "redressability analysis hinges on whether a court can effectively give [the plaintiff the] relief" he has requested, and when

the plaintiff seeks relief that "the relevant agency lacks the statutory authority to award," the plaintiff lacks standing. *Taylor*, 875 F.3d at 855. Unfortunately for plaintiffs, that is this case.

Plaintiffs respond that they or their representatives *did* act before the statutory deadline expired—it's just that the action they took was not in this case. The visa-seeking plaintiffs are members of a class certified in *Gomez v. Trump*, 490 F. Supp. 3d 276, 294 (D.D.C. 2020), and defined as "[i]ndividuals who have been selected to receive an immigrant visa through the U.S. Department of State's FY 2020 Diversity Visa Lottery and who had not received their immigrant visa on or before April 23, 2020, when the Presidential Proclamation 10014, later extended by Presidential Proclamation 10052, took effect." In *Gomez*, on September 30, 2020, just before the 2020 fiscal year expired, the court ordered the Department of State "to reserve 9,095 diversity visa numbers after September 30, 2020, for the future processing of the Named Plaintiffs' and class-members' diversity visa applications, pending final adjudication of this matter." *Id.* at 295. Further, in a previous order in the same case, the court had ordered the Department of State and other defendants to "undertake good-faith efforts, directly and through their designees, to expeditiously process and adjudicate DV-2020 diversity visa and derivative beneficiary applications and issue or reissue diversity and derivative beneficiary visas to eligible applicants by September 30, 2020." *Gomez v. Trump*, 485 F. Supp. 3d 145, 205 (D.D.C. 2020), *amended in part*, 486 F. Supp. 3d 445 (D.D.C. 2020), and *amended in part sub nom. Gomez v. Biden*, No. 20-CV-01419, 2021 WL 1037866 (D.D.C. Feb. 19, 2021). Plaintiffs contend that because the *Gomez* court entered these orders on their behalf before the expiration of the 2020 fiscal year, *Iddir* and like cases do not apply to them. Citing *American Pipe & Construction Co. v. Utah*, 414 U.S. 538, 552-53 (1974), plaintiffs argue that this case is more like one in which the statute of limitations is tolled because

a similarly situated plaintiff has already taken action on their behalf as a putative class representative.

Defendants reply that "to the extent Plaintiffs challenge the government's compliance with a court order issued in the *Gomez* class action, those issues must be raised in that still pending case, not through a new lawsuit filed in this court." (Reply Br. at 3, ECF No. 29.) Indeed, defendants argue, that is precisely why the *Gomez* court reserved 9,095 visa numbers. The Court agrees with defendants. Plaintiffs' position is not consistent with the reasoning of *Iddir*, which was that, although the government lacks the statutory power to adjudicate visa applications after the expiration of the fiscal year, if a court orders the government to adjudicate applications *before* the statutory deadline passes, and the government fails to do so, then to allow the government to take refuge behind the statutory deadline would "impinge on the authority of the court." 301 F.3d at 501 n.2. In other words, the court retains the power to enforce its own order, even after the statutory deadline. *See Gomez v. Trump*, 490 F. Supp. 3d 276, 284-86 (D.D.C. 2020) (citing *Paunescu*, 76 F. Supp. 2d at 903, and *Przhebelskaya v. U.S. Bureau of Citizenship & Immigr. Servs.*, 338 F. Supp. 2d 399, 404 (E.D.N.Y. 2004)). It does not follow that, because the *Gomez* court entered an order in favor of plaintiffs in a different case, this Court can somehow enforce that order by allowing plaintiffs to proceed with this case. It is undisputed that plaintiffs took no action in *this* Court prior to the expiration of the statutory deadline, and the Court fails to see what power it has to enforce the *Gomez* court's orders. As defendants argue, if plaintiffs want to enforce the *Gomez* court's order, then they must go to the *Gomez* court. Plaintiffs cite no cases in which timely action in one court permitted a plaintiff to bring a separate, otherwise untimely action in a different court, nor is this Court aware of any pertinent authority to that effect.

Plaintiffs mention the All Writs Act, 28 U.S.C. § 1651, but the Court is not convinced that invoking the All Writs Act is appropriate here:

> The All Writs Act is a residual source of authority to issue writs that are not otherwise covered by statute. Where a statute specifically addresses the particular issue at hand, it is that authority, and not the All Writs Act, that is controlling. Although that Act empowers federal courts to fashion extraordinary remedies when the need arises, ***it does not authorize them to issue ad hoc writs whenever compliance with statutory procedures appears inconvenient or less appropriate***.

*Pennsylvania Bureau of Correction v. U.S. Marshals Serv.*, 474 U.S. 34, 43 (1985) (emphasis added). "Compliance with statutory procedures" may have been "inconvenient," but the Court fails to see why plaintiffs could not have brought this action before the statutory deadline expired.

Regardless of the merits of plaintiffs' diversity visa applications, plaintiffs' diligence during the application process, the State Department's reasons for delay (or lack thereof), or anything else, "the bell has tolled midnight, and this Court cannot unring it." *Yung-Kai Lu v. Tillerson*, 292 F. Supp. 3d 276, 283 (D.D.C. 2018) (citing *Iddir*, 301 F.3d at 500), *aff'd sub nom. Yung-Kai Lu v. Pompeo*, No. 18-5066, 2018 WL 5919254 (D.C. Cir. Oct. 19, 2018). The Court cannot order the Department of State to adjudicate their visa applications now, more than a year after the relevant statutory deadline has expired, because the Department is powerless to do so.

### B. Monetary Relief Is Unavailable Due to Sovereign Immunity

Plaintiffs also seek monetary relief in the amount of the fees they have had to pay and other expenses they have incurred in preparing their visa applications, including expenses for medical certifications. Defendants argue that this relief is unavailable because any such claim requires a waiver of sovereign immunity, and plaintiffs have not pointed to any applicable waiver. *See Chattler v. United States*, 632 F.3d 1324, 1330 (Fed. Cir. 2011) (finding plaintiff's claim that he paid fees for a service he did not receive was barred by sovereign immunity).

"To maintain an action against the United States in federal court, a plaintiff must identify . . . a federal law that waives the sovereign immunity of the United States to the cause of action." *Clark v. United States*, 326 F.3d 911, 912 (7th Cir. 2003). The APA "explicitly precludes compensatory relief against the government." *Yung-Kai Lu*, 292 F. Supp. 3d at 283 (citing *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 261-62 (1999) and 5 U.S.C. § 702). However, citing *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988), plaintiffs argue that they seek not "compensatory relief" in the nature of "money damages" but "restitution," which, according to plaintiffs, is the sort of "specific relief" that falls within the scope of the APA's waiver of sovereign immunity.

Plaintiffs are correct that the waiver of sovereign immunity in the APA applies only to "relief other than money damages," 5 U.S.C. § 702, and the mere fact that relief requires the payment of money does not make the relief "money damages." To the extent that the payment of money is "specific relief," *i.e.*, "'giv[ing] the plaintiff the very thing to which he was entitled,'" rather than compensatory or "substitute relief," it is not the payment of "money damages," and therefore it falls within the scope of the APA's waiver of sovereign immunity. *Bowen*, 487 U.S. at 895 (quoting *Maryland Dep't of Hum. Res. v. Dep't of Health & Hum. Servs.*, 763 F.2d 1441, 1446 (D.C. Cir. 1985) (Bork, J.)).

But plaintiffs do not explain, and the Court fails to see, why the monetary relief they seek is specific relief rather than substitute relief. It is certainly nothing like the relief at issue in *Bowen*. In *Bowen*—as the Supreme Court later explained in *Blue Fox*—the Commonwealth of Massachusetts had sued the Secretary of Health and Human Services to "enforce a provision of the Medicaid Act that required the payment of certain amounts to the State for Medicaid services." *Blue Fox*, 525 U.S. at 261. The Supreme Court "held that the State's suit was not one 'seeking

money in *compensation* for the damage sustained by the failure of the Federal Government to pay as mandated; rather, it [was] a suit seeking to enforce the statutory mandate itself, which happens to be one for the payment of money.'" *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 262 (1999) (quoting *Bowen*, 487 U.S. at 900). That holding has no application here. Plaintiffs are not seeking to compel the government to pay money that a statute requires it to pay them; they are arguing that they were damaged in the amount of the fees they paid to the government and the funds they expended to obtain medical certifications to support their futile visa applications. Properly characterized, that is substitute relief designed to compensate plaintiffs for their loss, not specific relief designed to give them the thing they are owed. Plaintiffs can call it "restitution," but the relief they seek is in the nature of money damages, at least for purposes of the APA's waiver of sovereign immunity. *See Blue Fox*, 525 U.S. at 263 (equitable lien is substitute, not specific relief, because its goal is to "seize or attach money in the hands of the Government as compensation for a loss resulting from" wrongdoing); *see also Bowen*, 487 U.S. at 919 n.2 (Scalia, J., dissenting) ("'restitution' in the judicial context commonly means money damages"). Therefore, plaintiffs are barred by sovereign immunity from obtaining the monetary relief they seek.

Plaintiffs argue that, even if they cannot obtain compensation in the amount of the fees and expenses incurred in seeking visas, they can at least obtain nominal damages, and a "request for nominal damages satisfies the redressability element of standing where a plaintiff's claim is based on a completed violation of a legal right." *Uzuegbunam v. Preczewski*, 141 S. Ct. 792, 802 (2021). While it is true that, under *Uzuegbunam*, the availability of nominal damages satisfies the redressability element of standing, the case does not solve plaintiffs' redressability problem because it does not solve the sovereign immunity problem. Nominal damages are money damages, and if other kinds of money damages are unavailable due to sovereign immunity, then so are

nominal damages. *See Am. C.L. Union of Massachusetts v. U.S. Conf. of Cath. Bishops*, 705 F.3d 44, 53 n.7 (1st Cir. 2013) ("a claim for nominal damages is foreclosed by [the government agency's] sovereign immunity"); *W. States Ctr., Inc. v. United States Dep't of Homeland Sec.*, No. 3:20-CV-01175-JR, 2021 WL 1896965, at *1 (D. Or. May 11, 2021) ("[T]here are no nominal damages available here . . . because of sovereign immunity."); *see also Reagan v. United States*, No. 3:18-CV-433-L-BK, 2019 WL 2807577, at *5 (N.D. Tex. May 24, 2019) (ruling that "compensatory, punitive, and nominal damages" against the "United States and the federal agencies" or against "any individual defendant acting in his/her official capacity" were barred by sovereign immunity); *Leonard v. United States Dep't of Def.*, 38 F. Supp. 3d 99, 105 (D.D.C. 2014) (nominal damages were not available "because the United States has not waived sovereign immunity for monetary relief for unconstitutional acts taken by government employees acting in their official capacities"), *aff'd sub nom. Leonard v. U.S. Dep't of Def.*, 598 F. App'x 9 (D.C. Cir. 2015). Plaintiffs have the burden of identifying a federal law that waives sovereign immunity in the circumstances presented by this case, and they have not done so.

Plaintiffs also seek declaratory relief, and, while no party specifically argues otherwise, the Court notes for completeness that the request for declaratory relief does not solve plaintiffs' redressability problem. "The Declaratory Judgment Act, 28 U.S.C. § 2201, alone does not provide a court with jurisdiction. Instead, just like suits for every other type of remedy, declaratory-judgment actions must satisfy Article III's case-or-controversy requirement." *California v. Texas*, 141 S. Ct. 2104, 2115 (2021). "Thus, to satisfy Article III standing, [courts] must look elsewhere to find a remedy that will redress the individual plaintiffs' injuries." *Id.* at 2116; *see City of Green Bay v. Bostelmann*, No. 20-C-479, 2020 WL 1492975, at *3 (E.D. Wis. Mar. 27, 2020) ("A remedy is only available under the [Declaratory Judgment] Act if the court has jurisdiction from some

other source."). As the Court has explained, there is no other remedy available, whether compensatory or injunctive—or at least, plaintiffs have not identified one. *See California*, 141 S. Ct. at 2116. To find standing in such circumstances would be to proceed with a case that could only end in the issuance of what would amount to "'an advisory opinion without the possibility of any judicial relief.'" *Id.* (quoting *City of Los Angeles v. Lyons*, 461 U.S. 95, 129 (1983) (Marshall J., dissenting) and citing *Steel Co.*, 523 U.S. at 107 ("psychic satisfaction is not an acceptable Article III remedy")); *see also Halverson v. United States*, No. 19-CV-477-JDP, 2020 WL 3058152, at *2 (W.D. Wis. June 9, 2020) (no case or controversy because government could not offer any effective remedy).

In summary, the Court agrees with defendants that the Department of State lacks the power to adjudicate plaintiffs' visa applications at this late date, and plaintiffs have not shown that the government has waived its sovereign immunity or that monetary relief is otherwise available to them. It does not escape the Court that this conclusion leads to a harsh result for plaintiffs. It was no different in *Iddir*, where Judge Flaum called the outcome "regrettabl[e]," and Judge Bauer, writing for the court, concluded his opinion with the maxim, "*Dura lex, sed lex*," *i.e.*, "The law is harsh, but it is the law." 301 F.3d at 501. Harshness notwithstanding, "[i]t is no exaggeration to say that 'an agency literally has no power to act . . . unless and until Congress confers power upon it.'" *City of Providence v. Barr*, 954 F.3d 23, 31 (1st Cir. 2020) (quoting *Louisiana Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 357 (1986)). Congress has not given the Department of State or any other government agency the power to do the things plaintiffs ask the Court to order the government to do in this case. Therefore, plaintiffs cannot establish the redressability element of standing, and there is no case or controversy here, so the Court lacks subject matter jurisdiction. The Court must grant defendants' motion to dismiss.

## CONCLUSION

The Court grants defendants' motion to dismiss for lack of jurisdiction [15]. Civil case terminated.

**SO ORDERED.**                                              **ENTERED:  November 18, 2021**


_____
**JORGE L. ALONSO**
**United States District Judge**